597 A.2d 1001

**Dirk Anthony RICE**

v.

**STATE of Maryland.**

No. 1953, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Nov. 1, 1991.

Certiorari Denied Feb. 12, 1992.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Clarence W. Sharp, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Argued before BISHOP, WENNER and CATHELL, JJ.

BISHOP, Judge.

Dirk Anthony Rice appeals from a conviction, on five counts, of cocaine related offenses, after a jury trial in Prince George's County.

## ISSUES

Appellant presents three issues:

I.   Whether the trial court erred in denying the motion to suppress evidence both at the pretrial hearing and during the course of the trial.

II.   Whether the trial court erred in admitting the testimony of the federal forensic chemist who failed to qualify as an analyst of controlled dangerous substances under Md.Cts. & Jud.Proc.Code Ann. § 10–1001 (1989).

III.   Whether the trial court erred in instructing the jury on flight and concealment of evidence, and in the content of the instruction on conspiracy.

## FACTS

In the summer of 1989, Sergeant P.M. Patterson of the Prince George's County Police Department received information from a confidential informant that Jamil and Jamal Wilson, twin black males, were involved in the large scale distribution of cocaine in the 3700 block of Walters Lane. According to the informant, they had a dark colored four-door Mercedes with temporary tags. Patterson discovered Jamal was currently wanted on armed robbery charges in Virginia, and both males were wanted in Prince George's County for handgun violations. This information was conveyed to the Special Operations Division, and Corporal Mills was assigned surveillance in the area of Hil–Mar Drive and Walters Lane. While on surveillance on July 12, 1989, Mills observed a dark Mercedes, four-door, with temporary tags, driven by a black male, about 20 years old, turn onto Hil–Mar Drive. Mills lost the vehicle momentarily but found it parked at the Forest Creek apartments in front of 6515 Hil–Mar Drive. About two hours later, the vehicle was driven out of the parking lot. Mills initiated a traffic stop.

Mills testified at the suppression hearing that the driver of the vehicle presented him with a drivers license and registration with the name Dirk Anthony Rice. At this point, Mills realized the driver was not Jamal Wilson, but he

still thought this was the vehicle for which he was looking and that maybe one of the Wilsons, or one of their guns, was in the car. Mills asked appellant how long he had the car, and appellant responded he bought the car a couple of days ago for $26,000 cash. Mills then asked appellant if he would mind stepping out of the car and opening the trunk. According to Mills, appellant responded he would not mind and appellant opened the trunk himself. As he was opening the trunk, appellant told Mills there was $15,000 cash in the trunk which he had been saving to give his uncle, Aldre Lowry, who had been shot in the eye in Washington, D.C. Mills testified he believed the money was drug money because of the way it was bundled in rubber bands. Mills then called Corporal Tayman, also of the Prince George's County Police Department, who advised Mills there was an open file on appellant. Mills kept appellant on the scene until Tayman arrived, 30 to 40 minutes later. Mills also called for a drug dog which arrived shortly before Tayman and indicated the presence of a controlled substance on the money.

Tayman arrived and asked appellant from where he was coming. Appellant responded he had come from Crystal Garner's house at 6515 Hil–Mar Drive, Apartment 201.

Appellant's version of these events is different. Appellant testified that after Mills pulled him over, appellant was surrounded by four police cars. According to appellant, Mills did not take just his license, he took his entire wallet and his keys. Appellant testified that he told the officer he did not have authority to look in the trunk and Mills replied, "You want to bet." Mills then opened the trunk, took the money out of appellant's car, and placed it on top of the police car. Appellant testified he was told he could not go anywhere until the drug dog arrived, which was at least an hour. He also testified he could not leave since his car was surrounded by police cars, the police had his wallet and keys, and they were searching his car.

When Tayman arrived, appellant answered Tayman's questions. Appellant told Tayman he had recently bought

the car with $26,000 of inherited cash and that he had just come from Crystal Garner's home. Tayman seized the car and the money for civil forfeiture, as proceeds from drug trafficking, and told appellant he was free to go.

Later the same day, Tayman and two other officers went to 6515 Hil–Mar Drive and spoke to Paula Crystal Garner. Tayman explained he thought appellant was using the house as a "stash house" for the sale of controlled substances and asked Garner if he could search the house. He told Garner that she did not have to allow him to search the house and if she refused permission he would have to apply for a search warrant. Garner stated she understood and then signed a written form consenting to the search. In a safe found in the apartment,[1] the police discovered a kilo of cocaine, a nine millimeter weapon, a .32 caliber gun, and several thousand dollars in cash, among other things.

At a pretrial hearing, appellant's motion to suppress the search of the automobile was granted, as was appellant's statement he was coming from Garner's house when he was stopped. The circuit court (McCullough, J.), refused however to suppress the search of Garner's house. Appellant argued that the search was "fruit" of the illegal stop during which Tayman obtained Garner's address. The circuit court found Tayman already knew Garner's address, prior to the stop, based on information supplied by a confidential informant.

We include additional facts as necessary in our discussion of the issues.

## I.

◼ Appellant argues the trial court erred at the pretrial motions hearing and during the trial in denying his motion to suppress the evidence found at Garner's apartment because the search of Garner's apartment was the product of

---

1. The police took the safe with them and obtained a search warrant prior to opening the safe.

the illegal stop and search of appellant's automobile. We do not agree.

■ To have succeeded, appellant must show that the evidence was derived from the exploitation of official misconduct. Once this is established, the State may remove the taint by showing either (1) an independent source, (2) inevitable discovery, or (3) that the connection between the primary illegality and the challenged evidence has become attenuated. *Bartram v. State*, 33 Md.App. 115, 167–68, 364 A.2d 1119 (1976).

Judge McCullough determined from the evidence presented at the suppression hearing that the police did not go to Garner's apartment, on the same day as the stop, as a result of the search of appellant's automobile or his statement. The trial court instead found that Tayman had an open investigation of appellant beginning in April 1989 as the result of information, which included Garner's address, that was supplied by a confidential informant.

In *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1991) the Court said:

When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee*, 298 Md. 565, 571, 471 A.2d 712, *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md. Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider "are limited to those produced at the suppression hearing, *see Trusty v. State*, 308 Md. 658, 521 A.2d

749 (1987), which are most favorable to the State as the prevailing party on the motion." *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22 (1990).

We shall affirm the rulings made at the pretrial motions hearing and at trial.

Corporal Tayman testified at the suppression hearing that the initial investigation of appellant commenced in April 1989. He said he was told in July 1989, by a confidential source, that appellant had just purchased a new Mercedes with cash. Tayman was also told appellant was using a residence at 6515 Hil–Mar Drive, Apartment 201, leased to Crystal, as a stash house, and that he had recently received a shipment of cocaine in kilo quantity. During cross-examination, Corporal Tayman admitted that at the preliminary hearing and on a search warrant he had stated he went to Garner's address based on information flowing from appellant's traffic stop. Tayman explained on redirect that it is his practice not to include information regarding confidential sources in search warrants and statements of charges, if he believes he has probable cause, without identifying the information from the confidential source. He stressed he had the information from the confidential informant prior to preparing the statement of charges and the search warrant, and prior to the automobile stop.

In denying appellant's pretrial motion to suppress, the judge said: "[I]t sounds reasonable to me that the officer believed that he had already had probable cause to apply for a search warrant, so why disclose the existence of a confidential informant if you don't have to?" Viewing the Tayman evidence in a light most favorable to the State, we do not find the judge clearly erroneous.

■ At trial, appellant renewed his motion to suppress. After argument from both attorneys, but no testimony, the trial court (Melbourne, J.) ruled: "The defendant's renewed motion to suppress will be denied having already been ruled upon by Judge McCullough, . . . ." Judge Melbourne's reliance on Judge McCullough's pretrial ruling was permissi-

ble. In *Louge v. State*, 37 Md.App. 41, 44, 375 A.2d 51 (1977), *aff'd*, 282 Md. 625, 386 A.2d 780 (1978), this Court stated:

> We have held that in the absence of an abuse of discretion the trial judge is entitled to rely on the pre-trial ruling of another judge as to motions which have been heard and decided prior to trial provided the ruling has been made by a court of competent jurisdiction.

## II.

Appellant's next contention is that the trial court erred when it admitted the expert testimony of a federal forensic chemist. Appellant argues that the test performed by federal chemist Lisa C. Holman was not admissible because, pursuant to Md.Cts. & Jud.Proc.Code Ann. § 10–1001 (1989), any chemical analysis relied upon by the State must be performed by an individual certified by the Department of Health and Mental Hygiene and performed in accordance with the procedures approved by that Department. Appellant's position, which was clearly stated at trial, was that regardless of "[w]hether Miss Holman testifies or not, she wouldn't be able to testify as to the compliance with this statute." Appellant misreads § 10–1001, *et seq.* Three interrelated statutes are pertinent to appellant's contention.

> Sec[tion] 10–1001 provides that a chemist's report is *prima facie* evidence that the evidence submitted to him was properly tested without the necessity of the chemist appearing in court. Sec[tion] 10–1002 ... sets forth the persons included in the chain of custody, namely, the seizing officer, the packaging officer, and the chemist who analyzed the substance submitted.... Sec[tion] 10–1003, however, requires the State, upon written demand by the defendant, to produce the chemist, analyst, or any person in the chain of custody as a prosecution witness. Where the defendant demands that the chain of custody be established, the provisions of § 10–1001 and § 10–1002 concerning *prima facie* evidence do not apply.

*Thompson v. State,* 80 Md.App. 676, 679–81, 566 A.2d 126 (1989). As we explained in *Best v. State,* 79 Md.App. 241, 255, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989), Section 10–1003 "spells out the procedures that must be followed by the State in order to utilize the evidentiary shortcuts" regarding the chain of custody and "the procedures that must be followed by the defendant to avoid those evidentiary shortcuts." The purpose behind these statutes was "to accelerate the trial of cases where there is no allegation that the evidence has been either purposefully adulterated or mistakenly substituted, by dispensing with the requirement that the chemist appear in court." 80 Md.App. at 682–83, 566 A.2d 126.

At trial, the chemist testified she was employed by the United States Postal Inspection Service as a forensic chemist. Prior to this, she worked for the Drug Enforcement Administration for six and a half years. She further testified regarding her educational background in chemistry and the analysis of controlled dangerous substances. She had conducted analyses of over 3,000 samples of suspected controlled dangerous substances and had testified approximately 35 times, as an expert, in federal courts in Washington, D.C., Virginia, Maryland, and New York City and State, and in state courts in Virginia and Maryland and the District of Columbia Superior Court. The trial judge accepted the chemist as an expert, and appellant restated his objection that the chemist was not qualified in accordance with the Courts and Judicial Proceedings Article, *supra.*

Appellant has misconstrued the requirements of § 10–1001, which provides, in pertinent part:

[A] report signed by the chemist or analyst who performed the test or tests as to its nature is prima facie evidence that the material delivered to him was properly tested under procedures approved by the Department of Health and Mental Hygiene, [and] that those procedures are legally reliable, ... without the necessity of the chemist or analyst personally appearing in court, provided the report identifies that chemist or analyst as an individ-

ual certified by the Department of Health and Hygiene, the Maryland State Police Department, the Baltimore City Police Department, or any county police department employing analysts of controlled dangerous substances, as qualified under standards approved by the Department of Health and Mental Hygiene to analyze those substances, [and] states that he made an analysis of the material under procedures approved by that department. . . .

We read Section 10–1001 to mean that for a chemist's report to be accepted *without the testimony of the chemist,* the chemist must be certified by the Department of Health and Mental Hygiene. A report signed by the chemist creates a rebuttable presumption that the chemist was certified and conducted the tests in accordance with standards recognized by the Department of Health and Mental Hygiene. The requirement of certification is not applicable in a case like the one *sub judice* in which the chemist appeared and personally stated her qualifications to the court. The court found her competent to testify as an expert and we agree. The requirement of certification alluded to in § 10–1001 and which is more fully set forth in Md.Regs.Code tit. 10, § 10.03.03 (1991) only applies when the chemist does not appear in court to testify. It ensures that the report was prepared by a competent individual in a competent manner. Where the chemist is present in the court room, the trial court has the opportunity to judge independently the chemist's qualifications as an expert and the safeguards established in the regulations become unnecessary.

### III.

■ Appellant's final contention is that the trial court erred in instructing the jury on flight and concealment of evidence and erred in the content of the instruction on conspiracy. Appellant argues there was an insufficient factual basis on which to instruct the jury on flight. We disagree.

When asked, the trial court is required to "give a requested instruction that correctly states the applicable law and that has not been fairly covered in instructions actually given." *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). *See* Md. Rule 4-325(c). To generate a jury issue regarding flight, there must be "sufficient evidence which, if deemed weighty and credible by the trier of facts, would support a finding" that appellant attempted to flee or conceal evidence. *Fisher v. State,* 28 Md.App. 243, 249, 345 A.2d 110 (1975), *cert. denied,* 276 Md. 743 (1976). "[A]n instruction as to flight of the defendant to avoid arrest may be given not only where it appears that he fled to avoid arrest after accusation of crime, but also where it may be inferred from the evidence that at the time of flight he knew he was or would be charged with the crime...." David E. Aaronson, *Maryland Criminal Jury Instructions and Commentary* § 2.24 at 123 (2d ed.1988).

On March 23, 1991, the police obtained a warrant to search 2602 Brinkley Road, appellant's father's residence. After delivery of a controlled package that contained a substance intended to resemble cocaine to 2602 Brinkley Road, a United States Postal Officer, Jeffrey Fry, executed a search warrant at the residence of appellant's father. The Inspector testified that he observed that a "toilet was refilling with water, and it had a cloudy appearance as though [there] were something in it. On the rim of the toilet, [he] noted that there was white residue powder. [He] also noted that there was a plastic baggie like the one that was in the express mail envelope in that trash can, and it had white residue in it." Appellant's father testified that appellant had opened the package, looked at it, and then flushed it down the toilet. As he was flushing the substance down the toilet, appellant told his father he believed somebody was trying to "set them up."

Another search warrant was executed at 2602 Brinkley Road on March 29, 1991. Before the warrant was executed, an officer, Detective Ledbetter, observed appellant leaving the residence. The Detective followed appellant's car three or four miles and was then instructed to take appellant into

custody. The Detective testified that "[a]pproximately three to four miles from 2602 Brinkley Road, [appellant] pulled into a gas station, and at that point he attempted to flee on foot." Appellant exited his car and began running across the parking lot. He was apprehended when he ran into two backup police officers for whom Detective Ledbetter had radioed.

Based upon this testimony, instructions on flight and concealment of evidence were entirely proper. Appellant flushed evidence down the toilet and ran from a police officer to avoid apprehension.

Appellant's argument regarding the conspiracy instruction has no merit. Appellant argues that "by giving such a detailed and lengthy instruction on what can be simply explained in a straight forward manner the trial court unduly accentuated and suggested Appellant's involvement in the crime." We have reviewed the instruction and found that it properly states the law of conspiracy. Moreover, there is no requirement that the trial court must adhere to a particular form when advising the jury. The conspiracy instruction constituted a little over two pages of 16 pages of instructions. We find no error.

JUDGMENTS AFFIRMED.

APPELLANT TO PAY THE COSTS.