708 A.2d 1113

Marvin PARTEE

v.

STATE of Maryland.

No. 1023, Sept. Term, 1997.

Court of Special Appeals of Maryland.

May 1, 1998.

238

Ryan Pumpian, Assigned Public Defender, Washington, DC (Stephen E. Harris, Public Defender, Baltimore and Jennifer P. Lyman, Assigned Public Defender, Washington, DC, on the brief), for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before HARRELL and BYRNES, JJ., and JOHN F. McAULIFFE, Judge (retired), Specially Assigned.

BYRNES, Judge.

Marvin Partee, appellant, was convicted by a jury in the Circuit Court for Prince George's County of possession of heroin with intent to distribute, possession of heroin, and

possession of marijuana. He was sentenced to an aggregate term of sixteen years imprisonment.

Before trial, appellant moved to suppress a large sum of cash, a baggie containing heroin, a black pouch containing heroin and marijuana, and a pocket calendar, all of which he maintained were fruits of a seizure of his person by the police in violation of his rights under the Fourth Amendment to the United States Constitution. The motions court granted the motion in part and denied it in part, suppressing the baggie of heroin and the cash as the fruits of an illegal seizure and ruling admissible the drugs in the pouch and the pocket calendar, as abandoned property.

On appeal, appellant presents one question for review, which we have rephrased:

Did the motions court err in ruling admissible physical evidence that left appellant's possession when he was illegally seized by the police?

We answer the question affirmatively, holding that the motions court erred in ruling that the pouch containing heroin and marijuana was abandoned property and, implicitly, that it was not the fruit of the illegal seizure of appellant's person. Accordingly, we reverse the judgments and remand for further proceedings.

## FACTUAL BACKGROUND

In the early morning hours of May 23, 1996, Sergeant Richard Logue and Officer Jerome Manley of the Prince George's County Police Department were on "high visibility" patrol in a crime-ridden area of Oxon Hill. The officers were sitting in their marked police cruiser, with Sergeant Logue at the wheel, when they observed a 1979 Pontiac station wagon drive down the street, make a U-turn,[1] and proceed back up the same street. The station wagon was occupied by a white male driver and by appellant, an African–American male, who was the front seat passenger. Sergeant Logue thought that

---

1. The officers testified that the U-turn was not illegal.

the station wagon "didn't belong" in the neighborhood and "wonder[ed] what they [were] up to." He decided to follow it.

The police cruiser fell in behind the station wagon. Soon the officers noticed that the wagon was picking up speed, eventually exceeding the posted speed limit by 15 miles per hour. They continued to follow the vehicle for about a mile. The station wagon stopped for a red light, pulled out when the light turned green, and made a legal left turn. At that point, the officers activated their cruiser's emergency equipment, including their high intensity lights, and made a traffic stop. The driver immediately pulled the wagon over to the side of the road.

The officers saw the interior dome light in the station wagon come on. Officer Manley noticed the driver move as if to reach under the seat. Sergeant Logue saw appellant look back and make a similar movement. The officers got out of the cruiser and started to walk toward the station wagon. Officer Manley had his gun drawn and pointed at the vehicle. Suddenly, appellant exited the vehicle and ran away from the officers. Both officers noticed that appellant was holding a small shiny black object in one hand. They testified that they thought the object was a gun.

Sergeant Logue ordered Officer Manley to stay with the driver, who was still sitting in the station wagon. With his gun drawn, Sergeant Logue chased appellant, yelling, "Stop, or I'll shoot, halt, police." Appellant kept running. As he rounded a corner, he tripped over a curb and fell down. When appellant started to get up, Sergeant Logue saw that he was still holding the black object. Sergeant Logue took cover and fired one shot at appellant. It missed. Appellant resumed flight by "crab-walking" away on all fours. At that point, Sergeant Logue noticed that appellant was no longer holding anything. He stopped shooting for that reason.

With his weapon still drawn, Sergeant Logue continued to run after appellant, intending to circle in front of him to head him off. According to Sergeant Logue, appellant reached to

his "groin area" and "c[ame] out with another black object," which was not shiny. Sergeant Logue explained:

At that point I'm screaming and yelling at him, "See your hands, pull your hands out, you know, stop, stop," and that's when all of a sudden he comes out with the black object. And as soon as I saw black in his hand, I started firing again.

Sergeant Logue fired three rounds at appellant from a distance of about twenty feet. At that precise moment, appellant threw the black object, staggered, and fell to the ground. He had been shot twice, once in the back of each leg. The black object landed beneath a parked car, a few feet away. As Sergeant Logue put it: "[A]s I hit him with the bullets he chucked [the black object] underneath the car."

Appellant lay on the ground, wriggling around and reaching into the front of his pants. Thinking that appellant might be trying to pull a weapon, Sergeant Logue struggled to get hold of his hands. Officer Manley came running up to assist. He and another officer who had arrived on the scene handcuffed appellant. Sergeant Logue then searched appellant's groin area. Instead of finding a weapon, he found a "large bagg[ie] of heroin, all individually packaged" and $800.00 in cash.

Sergeant Logue retrieved the black object from beneath the parked car. It was a pouch that looked like a camera bag. Part of a cellophane bag containing marijuana was protruding from one corner of the pouch. Sergeant Logue opened the pouch and found marijuana and heroin. He then returned to the spot where he had fired at appellant and missed. There he found a small black pocket calendar containing credit cards and papers listing many names and telephone numbers. According to Sergeant Logue, the black pocket calendar was the first object that he had mistaken for a gun; the pouch was the second such object.

Sergeant Logue and Officer Manley were the only witnesses to testify at the suppression hearing. At the conclusion of their testimony, the motions judge examined the pouch and the pocket calendar. The court then ruled that the police

officers had "no reason whatsoever" to "accost" appellant or to pursue him. The judge implicitly rejected Sergeant Logue's testimony that he believed that the black objects that had appeared in appellant's hand were guns, remarking that "there are a lot of black objects which may or may not be guns" and that the officers "were not threatened at all." [2] The motions court suppressed the heroin found inside appellant's pants and the cash as fruits of an illegal seizure of appellant's person by the police. It did not specify when, prior to the search that yielded the suppressed contraband and cash, appellant was seized. With respect to the pouch containing heroin and marijuana, the court stated: "Its jettison property, its abandoned and the police had every right to pick it up, even if none of this occurred."

At trial, Officer Logue testified consistent with his testimony at the suppression hearing. Officer Manley did not testify, as he was out-of-state on vacation. Appellant moved the trial court for reconsideration of the denial of the motion to suppress the contraband in the pouch and the pocket calendar. The trial judge denied the motion, stating that she agreed with the decision made by the motions judge. The State called a chemist, who confirmed that the substances inside the pouch were heroin and marijuana, and a narcotics expert, whose testimony it used to argue that the names and numbers recorded in the pocket calendar were evidence of an intent to distribute on appellant's part. Following his conviction and sentencing, appellant noted a timely appeal.

## DISCUSSION

### I

### *Standard of Review*

In reviewing the denial of a motion to suppress, we consider only the record of the suppression hearing. *Trusty v. State,*

---

**2.** In oral argument before this Court, the State conceded that the motions court made a factual determination that the police officers did not reasonably believe that the black object (or objects) in appellant's hand was a gun.

308 Md. 658, 670–71, 521 A.2d 749 (1987)(citing *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied*, 294 Md. 652 (1982)).[3] We "extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts." *Dedo v. State*, 105 Md.App. 438, 446, 660 A.2d 959 (1995), *reversed on other grounds*, 343 Md. 2, 680 A.2d 464 (1996). When those facts are in dispute, we accept the motions court's factual findings, unless they are clearly erroneous. *Jones v. State*, 343 Md. 448, 457–58, 682, A.2d 248 (1996). Moreover, we rely only on the facts adduced at the suppression hearing that are "most favorable to the State as the prevailing party." *Id.* at 458, 682 A.2d 248 (quoting *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22 (1990)); *see also Matthews v. State*, 106 Md.App. 725, 732, 666 A.2d 912 (1995), *cert. denied*, 341 Md. 648, 672 A.2d 623 (1996). Finally, when the question is whether a constitutional right has been violated, we perform our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Carroll v. State*, 335 Md. 723, 736, 646 A.2d 376 (1994); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990).

---

**3.** The State argues that our review should focus on the record at trial and the trial court's ruling because the trial court held a *de novo* hearing on the motion to suppress, under Maryland Rule 4–252(h)(2). The State is incorrect. Rule 4–252(h)(2) provides, in pertinent part, that "[i]f the [motions] court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a party and in the exercise of its discretion, grants a supplemental hearing or a hearing *de novo* and rules otherwise." The trial court did not grant or conduct a supplemental or a *de novo* hearing, which would have required that evidence be taken outside of the presence of the jury and would have included an opportunity for appellant to call witnesses. *See Logue v. State*, 282 Md. 625, 627–28, 386 A.2d 780 (1978) (addressing Rule 729(g)(2), the predecessor to Rule 4–252(h)(2)). Rather, the trial court heard some of the evidence presented at trial and denied appellant's motion for reconsideration. Without granting a supplemental or *de novo* hearing, the trial court was bound by the hearing court's ruling. If the trial court had been inclined to grant the motion for reconsideration, it could then have granted a supplemental or *de novo* hearing. That did not happen.

## II

### *Fourth Amendment Seizure*

The Fourth Amendment protects "the right of the people to be secure in their persons, papers, and effects, against unreasonable searches and seizures . . ." U.S. Const., amend. IV. This protection extends to property and places in which an individual has a "legitimate expectation of privacy." Abandoned property is outside of the ambit of Fourth Amendment protection because its owner has forfeited any expectation of privacy that he once had in it. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668, (1960); *United States v. Leshuk,* 65 F.3d 1105, 1111 (4th Cir.1995); *Stanberry v. State,* 343 Md. 720, 731, 684 A.2d 823 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997); *Morton v. State,* 284 Md. 526, 531, 397 A.2d 1385 (1979); *Everhart v. State,* 274 Md. 459, 483, 337 A.2d 100 (1975). Accordingly, the police are free to confiscate property that is abandoned by an individual before he is seized by them, even if the seizure is found to be illegal under the Fourth Amendment. *Hester v. United States,* 265 U.S. 57, 58, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (Holmes, J.).

Appellant argues that the motions court erred in ruling, by implication, that appellant abandoned the pocket calendar and the black pouch containing heroin and marijuana before he was "seized," within the meaning of the Fourth Amendment. He maintains that he was seized by Sergeant Logue when the officer fired at him and missed and that the pocket calendar and the contraband in the pouch were fruits of that seizure, which, he argues, was unreasonable and thus unlawful. The State counters that, as a matter of law, a seizure that brought to bear appellant's Fourth Amendment rights did not occur until he was handcuffed by the police officers, after he had abandoned the pocket calendar and the pouch containing the marijuana and heroin. The police thus took possession of the contraband and the pocket calendar lawfully and the motions court properly denied the motion to suppress them.

At what point a person has been "seized," for Fourth Amendment purposes, is an "ultimate, conclusionary fact" about which "we must make our own independent constitutional appraisal." *Dedo v. State,* 105 Md.App. at 446, 660 A.2d 959 (validity of search is ultimate fact subject to independent constitutional review); *see Riddick v. State,* 319 Md. at 183, 571 A.2d 1239. *Cf. 5297 Pulaski Highway, Inc. v. Town of Perryville,* 69 Md.App. 590, 605–06, 519 A.2d 206, *cert. denied,* 309 Md. 521, 525 A.2d 636 (1987)(independent appellate review of constitutional fact of obscenity). Our starting point in answering that threshold question in this case is the Supreme Court's landmark decision in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Hodari D.,* police officers patrolling a high-crime area observed several youths, including Hodari D., huddled around a parked car. When the officers approached, the youths fled. The officers gave chase on foot. As Hodari D. ran, he discarded what appeared to be a small rock. Moments later, he was tackled by a police officer and then handcuffed. While Hodari D. was in custody, the police retrieved the rock-like substance from where he had dropped it. It was tested and found to be crack cocaine. Juvenile proceedings were brought against him.

The issue before the Supreme Court was "whether, at the time he dropped the drugs, Hodari D. had been 'seized' within the meaning of the Fourth Amendment." *Hodari D.,* 499 U.S. at 623, 111 S.Ct. at 1549. Holding that a Fourth Amendment seizure occurs either when the subject yields to a "show of authority" by the police or when the police apply physical force, *id.* at 626, 111 S.Ct. at 1550, the Court concluded that because Hodari D. did not submit to the officer's "show of authority" during the foot chase, he was not "seized" until he was tackled. The cocaine that Hodari D. had discarded before he was tackled was abandoned by him and was not obtained by the police as a result of their seizure of his person (which had been conceded by the State of California to have been unlawful). *Id.* at 629, 111 S.Ct. at 1552; *see also Brummell v. State,* 112 Md.App. 426, 429–34, 685 A.2d 835 (1996); *Henderson v. State,* 89 Md.App. 19, 23, 597 A.2d 486 (1991),

*cert. denied,* 325 Md. 396, 601 A.2d 129 (1992); *Johnson v. State,* 87 Md.App. 579, 581–82, 590 A.2d 1069 (1991).

■ In the instant case, if we assume that Sergeant Logue engaged in a "show of authority" by chasing appellant on foot, commanding him to halt, and attempting to shoot him, appellant was not then seized.[4] He did not submit. Instead, he continued to flee, discarding the pocket calendar along the way. The motions court correctly ruled that appellant abandoned the pocket calendar before he was seized by the police. Accordingly, the Fourth Amendment did not apply to the officers' appropriation of that item.

The State bases its contention that appellant was not seized for Fourth Amendment purposes until the officers applied handcuffs to him on the premise that, by writhing about and reaching into his pants as he lay on the ground, appellant persisted in defying Sergeant Logue's "show of authority," even though he had been shot in the legs and was no longer fleeing. The State's position is not supported by the law. In *Hodari D.,* the Supreme Court made plain that a seizure of a fleeing suspect occurs *either* upon submission by the suspect to the police officer's show of authority *or* upon the officer's application of physical force to the suspect to restrain movement. The Court held that Hodari D. was "unquestionably seized" when he was tackled, not when he was later handcuffed, because the tackle constituted the physical restraint that brought his flight to an end. *Hodari D.,* 499 U.S. at 629, 111 S.Ct. at 1552.

*Brower v. Inyo County,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), is also instructive. There, the Court held that a suspect who had been involved in a high speed police chase had not been "seized" during the chase but was "seized"

---

**4.** The test for a "show of authority" is whether the officer's words and actions would have conveyed to a reasonable person that he was being ordered to restrict his movement. *Hodari D.,* 499 U.S. at 627–28, 111 S.Ct. at 1551 (citing, *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)); *Lawson v. State,* 120 Md.App. 610, 707 A.2d 947 (1998).

when he crashed into a concealed roadblock erected by the police to stop him. Reasoning that a seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied," Id.* at 597, 109 S.Ct. at 1381 (emphasis in the original), the Court concluded that Brower's fatal impact with the police roadblock constituted a seizure of his person by the police because he was "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. at 1382; *see also Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)(fatal shooting of fleeing suspect by police officers is seizure subject to reasonableness requirement of Fourth Amendment).

In an effort to distinguish this case from these evidently unfavorable Supreme Court rulings, the State likens Sergeant Logue's shooting of appellant to the slight physical contact between the fleeing suspect and the pursuing police officer that we held not to constitute a Fourth Amendment seizure in *Brummell v. State, supra,* 112 Md.App. 426, 685 A.2d 835. Its analogy is misplaced and unconvincing. In *Brummell,* the suspect threw a baggie containing cocaine into the air as he was being chased on foot by the police officer. The officer caught up to the suspect and tackled him. Remarking that the case was on all fours with *Hodari D.,* this Court, through Judge Moylan, held that the suspect was seized for Fourth Amendment purposes when he was tackled and that he had discarded the drugs before then. Judge Moylan commented that a collision between Brummell and the police officer that occurred during the chase and that momentarily interrupted but did not stop Brummell's flight was not a seizure because it was not an intentional application of physical force to restrain movement.

The encounter in *Brummell* on which the State relies has no application to the events in the case *sub judice.* Sergeant Logue's shooting of appellant was not an inadvertent physical brush of no consequence. It was a potentially lethal application of physical force, albeit indirect, that restrained appellant's movement and ended his flight by the "very instrumen-

tality" put in place to achieve that purpose. *Brower*, 489 U.S. at 599, 109 S.Ct. at 1382. Appellant was shot down and made no attempt to continue his flight thereafter.

■ Appellant's person was seized and the Fourth Amendment became applicable when he was shot in the legs. Whether Sergeant Logue's efforts to stop appellant from reaching into his pants constituted a "show of authority" and whether appellant yielded are beside the point. Appellant already was seized. By handcuffing him, the police simply increased the magnitude of the in-place physical restraint that constituted the seizure.[5]

## III

### *Fourth Amendment Violation*

■ The Fourth Amendment does not protect citizens against all searches and seizures by government actors; it affords protection only against those that are *unreasonable*. *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430 (1992). In assessing whether Sergeant Logue's seizure of appellant was constitutionally reasonable, we conduct a *de novo* review of the facts leading up to the seizure, with deference to the factual findings on which the suppression court rested its ruling. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *Jones v. State*, 111 Md.App. 456, 465–66, 681 A.2d 1190, *cert. denied*, 344 Md. 117, 685 A.2d 451 (1996). We perform our task by "look[ing] to the totality of the circumstances—the whole picture . . . in light of the facts and circumstances found to be credible by the

---

5. Whether the officers handcuffed appellant simply to control his movements or for the purpose of taking him into custody (or both) could be relevant to whether appellant was arrested, and not merely seized, when he was handcuffed. *See Morton v. State*, 284 Md. 526, 530, 397 A.2d 1385 (1979) ("an arrest is the taking, seizing or detaining of the person of another, *inter alia*, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest.") That issue is not before us and its resolution is not necessary to our analysis of the question presented.

[suppression hearing] judge." *State v. Lemmon,* 318 Md. 365, 379, 568 A.2d 48 (1990).

In *Dennis v. State,* 342 Md. 196, 674 A.2d 928 (1996)(*Dennis I* ), the Court of Appeals held that to justify detaining a passenger in an automobile that has been stopped for a traffic violation, "the officer must have a reasonable suspicion that the passenger engaged in criminal behavior and must have intended to conduct further investigation based on that suspicion." *Id.* at 212, 674 A.2d 928. In that case, a police officer attempted to make a traffic stop of a vehicle that had driven through a red light. The vehicle increased its speed and ignored the flashing lights of the police car. Finally, it pulled into a driveway in a residential neighborhood and stopped. The driver remained in the vehicle but the passenger got out. Ignoring the officer's commands to get back inside the vehicle, the passenger began to walk away. The officer continued to yell for him to return to the vehicle, to no avail. The officer chased and tackled the passenger, who struck the officer and fought with him. The passenger was convicted of disorderly conduct and battery. *Dennis I,* 342 Md. at 200, 674 A.2d 928.

The Court reversed, ruling that the record disclosed that the officer did not intend to make an investigatory *Terry* stop. *Id.* at 212, 674 A.2d 928; *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Rather, he justified his detention of the passenger on the basis of his and his partner's safety. The record was devoid, however, of any "articulated reason why the officers would be safer by detaining the [passenger], rather than simply allowing him to walk away from the scene." *Id.* at 211, 674 A.2d 928. The Court concluded that the officer's forcible detention of the passenger amounted to an illegal arrest that the passenger was legally entitled to resist. *Id.* at 212, 674 A.2d 928.

The Supreme Court granted certiorari in *Dennis I* and vacated the judgment, directing that the Court of Appeals reconsider the case in light of *Whren v. United States,* 517

U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[6] *Maryland v. Dennis,* —— U.S. ——, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996). In *Dennis v. State,* 345 Md. 649, 693 A.2d 1150 (1997) (*Dennis II* ), the Court reaffirmed its prior holding, ruling that *Whren* was inapposite and that, while a basis for a *Terry* stop may have existed, the arresting officer had testified that that was not the reason that he had detained the defendant. The reason given—that stopping the passenger was necessary for safety concerns—was unsupported by the record.

In *Dennis I,* the Court observed that, ordinarily, there is no reason to believe that a passenger in a vehicle is guilty, as an accessory or abettor, of the traffic offense with which the driver may be charged. 342 Md. at 206, 674 A.2d 928. The Court commented further that it is "only when the passenger's actions are consistent with those of an accessory or aider or abettor that a police officer has a basis for focusing on and/or charging the passenger." *Id.* In the instant case, the record contains no such evidence. Moreover, like the police officer in *Dennis I,* Sergeant Logue never explained or attempted to explain his pursuit and forceful detention of appellant on the basis of a *Terry* stop. He neither stated nor suggested that he was investigating any suspected criminal behavior of appellant, or that he intended to do so. To the contrary, Sergeant Logue acknowledged that throughout the events in question, he had "no personal knowledge that [appellant] had committed any crime." The only reason articulated by Sergeant Logue for chasing and shooting appellant was "because I was in fear of my life, that [appellant] was pulling a gun to fire at me."

The motions judge inspected the pocket calendar and pouch, assessed the officers' credibility, and rejected Sergeant Logue's justification for the shooting. Our examination of the

---

**6.** In *Whren,* the petitioner contended that, because traffic violations are often pretexts used by the police to stop drivers for other, unarticulated reasons, probable cause that a traffic violation has occurred is not sufficient to establish the constitutional reasonableness of such a stop; instead, the government must show that a reasonable officer, acting reasonably, would have made the traffic stop for the reason given. The Supreme Court rejected that contention.

record reveals that the motions judge's findings are supported by the evidence. From the time that appellant exited the station wagon until he was shot down, he was moving away from Sergeant Logue. He did nothing to threaten or attack Sergeant Logue. At all times, appellant was attempting to distance himself from the officer, not to confront him. Even when Sergeant Logue observed that appellant was "crab-walking away" empty handed, he continued to chase him with his gun drawn. He did so for the stated purpose of "circling around to head him off," *i.e.*, to place himself in a position directly in appellant's flight path. Sergeant Logue's plan to confront appellant, which, if carried out, would have increased his risk of harm had appellant been carrying a gun, was inconsistent with his claim that he chased and shot appellant only because he feared that appellant would shoot him.

■ Appellant was acting within his rights to exit the station wagon and walk or run away. *Dennis I*, 342 Md. at 212, 674 A.2d 928. When he did so, however, he was seized violently by a police officer who did not have a warrant or probable cause to support an arrest, who lacked articulable suspicion that criminal conduct was afoot, under *Terry v. Ohio*, and who did not have reason to suspect that appellant posed an imminent threat (or any threat) to his safety. The motions court correctly ruled that, under the totality of the circumstances, Sergeant Logue's seizure of appellant's person was constitutionally unreasonable.

## IV

### *Abandonment*

Appellant argues that, if he was seized when he was shot and the seizure was illegal, as we have held that it was, the hearing court erred in ruling that the contraband in the black pouch was admissible as abandoned property. He contends that the illegal seizure of his person produced this evidence; it was thus tainted and should have been excluded under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d

441 (1963), and *Silverthorne v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

In *Brummell v. State,* Judge Moylan observed:

Although the difference may be measured in nanoseconds, there is a critical distinction, in terms of Fourth Amendment applicability, between the jettison of contraband that precedes a police tackle and the jettison that follows a tackle.

112 Md.App. at 433, 685 A.2d 835. In affirming the suppression court's ruling that the police had not obtained the contraband from Brummell as the fruit of their seizure of him, Judge Moylan noted that "all of the testimony ... established unequivocally that the jettison [of the contraband] preceded the tackle. *Id.*

In cases such as *Brummell,* in which the challenged evidence was discarded before the illegal seizure and hence before the point of Fourth Amendment applicability, there can be no causal nexus between the Fourth Amendment violation and the disposal of the evidence. Accordingly, in those cases, we do not reach the question whether the evidence is the fruit of the illegal seizure. *Stanberry v. State, supra; Venner v. State,* 279 Md. 47, 52, 367 A.2d 949, *cert. denied,* 431 U.S. 932, 97 S.Ct. 2638, 53 L.Ed.2d 248 (1977); *Everhart v. State, supra.* In post-seizure abandonment cases, in which the challenged evidence was discarded during or after the point of unlawful seizure, however, the Fourth Amendment is applicable at the time of the seizure and we must analyze whether the purported abandonment was voluntary and whether the evidence was a tainted product of the illegal seizure (which are, in effect, the same question).[7]

---

7. In post-seizure abandonment cases, if the seizure at issue did not violate the Fourth Amendment, the related issues of the voluntariness of the abandonment and the tainted nature of the evidence do not arise. *See U.S. v. Maryland,* 479 F.2d 566, 568 (5th Cir.1973) ("a lawful arrest does not in itself amount to such compulsion as will render an otherwise voluntary abandonment involuntary."); *see also Glover v. State,* 14 Md.App. 454, 462, 287 A.2d 333, *cert. denied,* 265 Md. 737 (1972), *overruled on other grounds, Goode v. State,* 41 Md.App. 623, 628, 398 A.2d 801 (1979) ("The action of [the defendant] in disposing of the

In the case *sub judice,* the motions court did not make an express finding about the timing of the shooting vis a vis appellant's release of the contraband-containing pouch. The first level facts in evidence were undisputed, however, as only Sergeant Logue testified about them. Sergeant Logue's testimony that "as I hit [appellant] with the bullets he chucked [the pouch] . . ." established that the pouch was in appellant's hand when he fired and struck him. Sergeant Logue's rationale for the shooting—that he thought the black object in appellant's hand was a gun—further substantiated that appellant was holding the pouch when he was shot. Just as there was unequivocal evidence in *Brummell* that the jettison of the contraband preceded the seizure, the evidence in the instant case established unequivocally that appellant did not let go of the pouch before he was "seized," *i.e.,* shot. Rather, appellant threw the pouch either at the exact moment that he was seized by Sergeant Logue or in the following "nanosecond."

Even though the holding of *State v. Lemmon, supra,* is limited by the Supreme Court's subsequent ruling in *Hodari D.,* the Court's discussion of what it viewed to be a Fourth Amendment post-seizure abandonment provides guidance. In *Lemmon,* three police officers received a tip that a black male was selling drugs on a particular block in Baltimore City. When they arrived on the block in question, they spotted Lemmon, a black male, who fled when they approached. Two of the officers gave chase on foot while the third followed in an unmarked car. Lemmon outran the officers who were chasing him and eluded a vehicle blockade created by the driving officer. He then pulled a vial of pills from his pocket and tried to shove it through a chain link fence. The vial bounced off of the fence and fell to the ground. Lemmon kept running. Eventually the officers caught up to him and overpowered him. Lemmon was charged with possession of narcotics with intent to distribute.

property before its seizure was the result of his own voluntary choice, and was not forced by the actions of the officers. The stop by the uniformed officer was, as we have shown, lawful.").

The circuit court denied a motion to suppress, ruling that Lemmon had abandoned the contraband before he was seized by the police and that the Fourth Amendment was thus inapplicable. Lemmon was convicted. In an unreported opinion, this Court reversed, concluding that Lemmon had been seized by the police before he discarded the vial. The Court of Appeals agreed, holding that Lemmon was seized during the police pursuit and that he later discarded the vial. After explaining its further holding that the seizure was constitutionally unreasonable, the Court concluded that "[t]he contraband was not rendered admissible by Lemmon's abandonment of it." *Lemmon*, 318 Md. at 380, 568 A.2d 48. It reasoned that the contraband should have been suppressed because its abandonment had been procured by the illegal seizure:

> Both the trial court and the intermediate appellate court recognized that a person may relinquish the Fourth Amendment right by voluntarily abandoning it. And both were aware of the limitations on the doctrine—it does not apply when the abandonment was the result of unlawful police action. When the abandonment is forced by illegal police conduct, it is not voluntary and its seizure offends the constitutional dictate.
>
> \* \* \* \* \*
>
> Since the abandonment was involuntary, as forced by illegal police conduct, the obtaining of [the evidence] by the police offended the Fourth Amendment. The motion to suppress should have been granted.

*Id.* at 380–81, 568 A.2d 48 (citations omitted).

The Court's legal conclusion that Lemmon was "seized" by the police during their pursuit of him was discredited in *Hodari D.*, as we have explained.[8] Its core holding—that a

---

8. In his dissent in *Lemmon*, Judge McAuliffe forecast the Supreme Court's ruling in *Hodari D.* He reasoned that Lemmon was not seized until he was intercepted by the police officers and that he had voluntarily relinquished the contraband before that point in time. *Lemmon*, 318 Md. at 383, 568 A.2d 48.

suspect's abandonment of evidence that was forced by a preceding illegal seizure of his person by the police is not voluntary—remains intact.

After *Hodari D.* was decided by the Supreme Court, the Fourth Circuit Court of Appeals held in *United States v. Wilson,* 953 F.2d 116 (4th Cir.1991) (Hall, J.) that contraband abandoned by an individual shortly after he had been illegally seized in violation of the Fourth Amendment was not voluntarily relinquished and was tainted by the seizure. Wilson disembarked a plane and was confronted by three federal narcotics agents. They surrounded him and asked him to allow them to question him and to search his carry-on bag and his coat, which was draped over his arm. Wilson consented to a limited search of his bag and then refused further cooperation. The agents followed him through the airport, outside, and into a parking lot, incessantly pestering him with questions until they had backed him into an area of the parking lot that was surrounded by a railing. To escape, Wilson jumped over the railing and ran, throwing his coat into the air as he did so. The officers gave chase, captured Wilson, and took possession of his discarded coat. The inside pocket of the coat held a paper bag that was found to contain crack cocaine. Wilson was convicted of possession of cocaine with intent to distribute.

The Fourth Circuit held that the agents had "seized" Wilson, within the meaning of the Fourth Amendment, before he discarded his coat and that the seizure was unreasonable and in violation of his constitutional rights. *Id.* at 126–27. In response to the government's contention that, even if its agents had acted unlawfully in seizing Wilson, they were entitled to confiscate the coat because he had abandoned it, the court ruled that Wilson's actions in throwing the coat after he was seized "did not amount to an abandonment such as would purge the taint from the police conduct:"

Unlike the situation in *Hodari D.,* the purported abandonment of the coat by Wilson occurred *after* he had been illegally seized. Wilson's action was clearly the direct result

of the illegal seizure, and it follows that the recovered drugs were the fruit of the illegality and must be suppressed. 953 F.2d at 127 (emphasis in original).

▮ The Fourth Circuit's holding in *Wilson* is consistent with the rulings of other federal appellate courts generally recognizing that when an unlawful seizure by the police prompts the abandonment of evidence, the abandonment is not voluntary and the evidence is tainted by the illegality and is inadmissible under the exclusionary rule. *See United States v. Coggins,* 986 F.2d 651, 655 (3d Cir.1993) (abandonment of evidence following illegal seizure was precipitated by seizure; abandonment could not cure taint); *United States v. Brady,* 842 F.2d 1313, 1315, n. 7 (D.C.Cir.1988) ("abandonment [as relinquishment of expectation of privacy] will not be recognized when it is the result of illegal police conduct"); *United States v. Lucci,* 758 F.2d 153, 155 (6th Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985); *United States v. Gilman,* 684 F.2d 616, 620 (9th Cir.1982); *United States v. Maryland,* 479 F.2d 566, 568 (5th Cir.1973). Yet, not every postseizure abandonment is necessarily involuntary and not all such evidence is necessarily tainted. A suspect's wilful relinquishment of evidence following an illegal seizure of his person can purge the taint of the illegal seizure and render the evidence admissible:

> While it is true that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest ... it is equally true that for this to occur the abandonment must be truly voluntary and not merely the product of police misconduct.

*United States v. Beck,* 602 F.2d 726, 729–30 (5th Cir.1979); *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973) (en banc). For example, in *United States v. Roman,* 849 F.2d 920 (5th Cir.1988), the court held that assuming (as the government conceded) that the defendant's Fourth Amendment rights had been violated by federal narcotics agents when they x-rayed his luggage, his disclaimer of the luggage several hours later, after he had been taken into custody, constitut-

ed an abandonment that was voluntarily carried out as an "act of free will" and was not causally connected to the prior misconduct of the agents. *Id.* at 923; see *also Fletcher v. Wainwright,* 399 F.2d 62 (5th Cir.1968)(evidence should be suppressed *unless* the "nexus between ... lawless [police] conduct and the discovery of the challenged evidence" has " 'become so attenuated as to dissipate the taint ...' " *Id.* at 64 (quoting, *Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417)).

In *United States v. Ward,* 961 F.2d 1526 (10th Cir.1992), *rev'd on other grounds, United States v. Little,* 18 F.3d 1499 (10th Cir.1994) (en banc), the court analogized the showing of voluntariness necessary to establish a post-seizure abandonment to the proof of voluntariness required to validate a consent to search property after a Fourth Amendment violation. Ward, a passenger on an Amtrak train, disclaimed ownership of his suitcase after he was illegally seized by federal narcotics agents. The agents searched the suitcase and found illegal drugs. The trial court denied a motion to suppress and Ward was convicted of a drug offense. Observing that the federal cases addressing post-seizure abandonments "suggest that when an alleged abandonment follows a Fourth Amendment violation the issue is whether the abandonment of property was voluntary," the court reversed Ward's conviction, holding that voluntariness must be addressed by determining whether "based on the totality of the circumstances, the abandonment is voluntary in fact, while giving sufficient weight to the three factors emphasized in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)." *Id.* at 1535. Those factors are: 1) the closeness in time between the Fourth Amendment violation and the alleged voluntary act; 2) "the presence of intervening circumstances;" and 3) "the purpose and flagrancy of the official misconduct." *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.

In Maryland, the Court of Appeals has applied the *Brown* voluntariness test not only to determine whether a suspect's consent " 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion,' " *McMillian v. State,* 325 Md. 272, 288, 600 A.2d 430 (1992) (quoting *Wong Sun,* 371

U.S. at 486, 83 S.Ct. at 416–17), but also to ascertain whether extrajudicial identification testimony was voluntarily given or was the fruit of an illegal arrest. *See Ferguson v. State,* 301 Md. 542, 549–50, 483 A.2d 1255 (1984). Although the Court has explained that the intent to relinquish any reasonable expectation of privacy in property "must ordinarily be assessed based on external manifestations, such as the owner's words and actions," *Stanberry v. State,* 343 Md. at 737, 684 A.2d 823, and while it has recognized that an abandonment must be intentional *and* voluntary, *id.,* it has not enunciated a standard for assessing the voluntariness *vel non* of an act of purported abandonment. We agree with the Tenth Circuit that the criteria for voluntariness set forth in *Brown v. Illinois* in the context of consent following an illegal seizure are equally applicable to determining voluntariness and taint in the context of a post-seizure abandonment, and we consider them as part of our independent constitutional review of the totality of the evidence.

Ordinarily, the State bears the burden of proving that a warrantless search and seizure of property was justified and hence reasonable. When the justification offered is that the property was abandoned, the State must prove that the evidence was voluntarily abandoned and was not tainted by a Fourth Amendment violation. Accordingly, in the case *sub judice,* the State bore the burden of proving that appellant abandoned the contraband-containing pouch, that he acted voluntarily in doing so, and that the evidence was not tainted by the illegal seizure of his person.[9]

The record contains no express findings by the motions court on the issues of voluntariness and taint. Our independent constitutional review of the record reveals that the

---

9. Appellant bore the burden of proving that he had standing to challenge the search and that there was a Fourth Amendment violation. *United States v. Poulsen,* 41 F.3d 1330, 1335 (9th Cir.1994); *United States v. Carhee,* 27 F.3d 1493, 1496 (10th Cir.1994). Apparently, because there was no dispute over appellant's reasonable expectation of privacy in the pouch and the pocket calendar before they were discarded, the issue of standing was not raised.

circumstances surrounding the shooting and appellant's disposal of the pouch, as derived from the undisputed first-level facts and the motions court's credibility findings, when viewed in light of the factors relevant to voluntariness in *Brown v. Illinois,* do not permit a rational inference or deduction that appellant actually relinquished possession of the pouch as an act of free will, and not as the involuntary consequence of the very application of force that constituted an illegal seizure. *Cf. Morton v. State,* 284 Md. 526, 534, 397 A.2d 1385 (1979) (Murphy, C.J.) (trial court erroneously denied motion to suppress contraband; inference of abandonment could not be justified on the undisputed facts; "the record wholly fails to demonstrate that the appellant, by actions or words, intended to abandon or relinquish his constitutionally protected expectation of privacy in the seized items."); *Mario Anello & Sons v. Dunn,* 217 Md. 177, 181, 141 A.2d 731 (1958)(where facts are undisputed and permit no inferences consistent with the existence of a supposed or asserted right, the existence of such a right is an unmixed question of law.)

Given that appellant was seized by Sergeant Logue at the same time that he lost physical possession of the pouch, the temporal nexus between the seizure and the purported abandonment could not have been closer. Although Sergeant Logue used the words "throw" and "chuck" to characterize appellant's release of the pouch, the facts related by him proved only that he shot appellant the instant that he saw the pouch in his hand. Sergeant Logue's testimony was devoid of facts to show words spoken or actions taken by appellant from which a rational conclusion could be drawn that he wilfully discarded the pouch. Indeed, the nature and location of appellant's wounds and his physical response to being shot (staggering and falling to the ground), precluded an assumption essential to any inference that appellant acted volitionally: that he possessed the degree of physical control over his body necessary to act wilfully to dispose of the pouch.[10]

---

**10.** Appellant's act of moving the pouch from his waist to his hand could allow a rational inference that he *intended* to discard it; it could not support a rational inference that he *wilfully,* that is volitionally, did so.

In most post-seizure abandonment cases, the defendant's physical ability to control his body sufficiently to enable him to keep or discard the property in his possession is understood and is not an issue. The voluntariness of an abandonment and the causal nexus between it and the illegal seizure that preceded it ordinarily are analyzed in terms of whether the "pressure" of the seizure—actual, perceived, and psychological—prompted the abandonment. *See Lemmon,* 318 Md. at 379, 568 A.2d 48. In this case, the analysis cannot rise to a plane beyond the most basic issue of physical connection. When he was shot, appellant sustained a physical impact to his body, which forced him to the ground. He was holding the pouch at the time. One cannot logically deduce, from those facts, that the impact that brought appellant to the ground had no effect on his physical ability or mental will to maintain possession of the pouch and had no causal connection to the movement of the pouch from his hand to the ground. In the absence of a single fact to demonstrate that appellant engaged in a conscious act of free will when he discarded the pouch, an inference that he voluntarily discarded the pouch at the very split second that the police were infringing upon his constitutional rights by violently seizing control of his body is neither rational nor permissible.

The temporal and physical connection between Sergeant Logue's illegal actions and appellant's purported abandonment of the pouch that negates any reasonable inference that he acted wilfully likewise precludes any rational conclusion that the taint of the illegality was purged, dissipated, or became sufficiently attenuated so as to warrant admission of the illegally obtained evidence. When the seizure and the purported abandonment are contemporaneous, as they were in this case, the opportunity for independent reflection and decision-making underlying the "temporal proximity" and "intervening circumstances" factors in *Brown v. Illinois* and militating in favor of voluntariness is missing.

We note that the third "voluntariness" factor in *Brown v. Illinois*—the "purpose and flagrancy of the official miscon-

duct"—seems at first blush out of place and, in the context of this case, perhaps unnecessary to discuss. Certainly, a person can intend to abandon property and willingly take action to do so even in the face of the most outrageous Fourth Amendment violation and even though the objective of the police was to obtain the evidence subsequently abandoned. *See Narain v. State,* 79 Md.App. 385, 392 n. 4, 556 A.2d 1158, *cert. denied,* 317 Md. 71, 562 A.2d 718 (1989) (observing that owner's state of mind in relinquishing property can be unconnected to contemporaneous illegal police activity). Nonetheless, the factor is relevant to the question whether the connection between the Fourth Amendment violation and the evidence sought to be suppressed is sufficiently attenuated to have "dissipat[ed] the taint of the ... illegality." *Ferguson v. State,* 301 Md. at 548, 483 A.2d 1255. Especially when the causal nexus between the illegal seizure and the actions of the accused (whether in consenting to a search or discarding property) is not as apparent as it is in this case, how reprehensible the constitutional violation may have been and whether it was perpetrated with the aim of obtaining the challenged evidence may bear on the issue of taint: was the evidence acquired by police exploitation of their own illegal conduct in seizing the defendant or by an avenue sufficiently distinguishable to be purged of the primary taint of that illegality? *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417.

In this case, the motions judge found that appellant abandoned the pouch and the contraband within it on undisputed facts that, as a matter of law, do not permit a rational inference that he did so as an act of free will. Our constitutional review of the totality of the circumstances reveals that the police obtained the black pouch and its contents by seizing appellant's person in violation of the Fourth Amendment. The motions court erred in denying appellant's motion to suppress the pouch and its contents.

**JUDGMENTS REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

COSTS TO BE PAID BY PRINCE GEORGE'S COUN-TY.